Filed 10/25/23  P. v. Velasquez CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CESAR VELASQUEZ,<br><br>        Defendant and Appellant. | B322450<br><br>(Los Angeles County<br>Super. Ct. No. BA480098) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Five men—Carlos V., Luis O., Jose P., Gerardo C., and an unidentified man—came to a hotel looking for defendant Cesar Velasquez. According to Carlos V., defendant earlier that evening had robbed Carlos V. of his wallet and phone, and Carlos V. had come with his companions to negotiate for their return.

Defendant came into the hotel hallway as Carlos V. knocked on doors looking for him. Luis O., positioned at the far end of the hallway out of defendant's view, immediately ran up behind him. Defendant walked towards the other four men, reaching for his waistband and shouting aggressively. Luis O. reached defendant and grabbed him in a chokehold from behind. Defendant began firing a pistol as Carlos V. and the unidentified man ran to help Luis O. subdue defendant. When the fight was over, defendant had shot and wounded both Carlos V. and Luis O. Defendant himself had been stabbed.

The jury convicted defendant of attempted voluntary manslaughter of Carlos V., assault with a firearm against Jose P. and Gerardo C., grossly negligent discharge of a firearm, and possession of a firearm by a felon. The jury acquitted defendant of the attempted murder or voluntary manslaughter of Luis O. Defendant appeals from the judgment.

The core question for the jury was whether defendant was an aggressor who initiated a confrontation with the five men, or instead, the victim of an attack to which he responded in justifiable self-defense. The evidence on this question was close. The jury heard Carlos V.'s and Luis O.'s preliminary hearing testimony that their intentions were peaceful, and when defendant drew his pistol and threatened them, they had no choice but to defend themselves. This testimony was potentially

in tension with security camera footage that arguably showed Carlos V.'s companions lying in wait as Carlos V. knocked on doors looking for defendant, and further showed Luis O. running up behind defendant as soon as defendant emerged from his hotel room before defendant brandished any weapon. The jury's verdict, which exonerated defendant as to Luis O. but convicted him as to Carlos V., Jose P., and Gerardo C., illustrates how close the evidence was.

Carlos V. and Luis O. did not appear at trial. The trial court found the prosecution had shown due diligence in attempting to secure their presence, declared them unavailable, and allowed the prosecution to read to the jury the transcript of their preliminary hearing testimony.

Given the closeness of the evidence, and the importance of Carlos V.'s and Luis O.'s testimony to the prosecution's case, we conclude under our independent review that the prosecution failed to demonstrate due diligence to secure those witnesses' presence at trial. The prosecution's efforts were limited largely to unreturned phone messages and unsuccessful attempts to serve subpoenas at their residences. When these limited efforts failed, the prosecution mostly just repeated them. When the prosecution finally located Carlos V. at a hospital and served him with a subpoena, the prosecution failed to take further steps to ensure this previously uncooperative witness would appear at trial, which indeed he did not. The prosecution never succeeded at contacting Luis O., only learning on the eve of trial that he was allegedly in Mississippi. At that point the prosecution took minimal and unsuccessful steps to confirm Luis O.'s location and made no further attempts to secure his presence at trial.

3

We conclude these efforts do not constitute due diligence under the applicable case law.  Accordingly, the prosecution failed to demonstrate the witnesses were unavailable and the trial court erred in admitting their preliminary hearing testimony.  This error was prejudicial given the close evidence and how important determining credibility was to the parties' competing explanations for the violence that took place at the hotel.

Because the erroneous admission of Carlos V.'s and Luis O.'s preliminary hearing testimony requires reversal of his convictions for voluntary manslaughter, assault with a firearm, and grossly negligent discharge of a firearm, we decline to reach defendant's additional arguments that the trial court erred in admitting gang evidence and did not properly instruct the jury on self-defense as to the assault counts.  We do, however, reach and reject defendant's contention that the evidence established as a matter of law that defendant acted in self-defense.

We further conclude that none of defendant's claims of error undercuts his conviction for possession of a firearm by a felon, which we therefore affirm.

## FACTUAL BACKGROUND

### 1.    *Security camera footage*

The jury viewed security footage taken from multiple cameras in the hotel.  The cameras did not record continuously, but would record when triggered by motion sensors.  As a result, there were gaps in the footage.  Further, the timestamp on the video was an hour behind actual time.  The video showed the following:

4

At 4:30 a.m., defendant and his girlfriend, R.G., entered the hotel and went into a room on the second floor. Defendant was carrying a blue bottle and a jug of juice.

Moments later, Carlos V. pulled his car into the hotel parking lot. He went up to the second floor, walked to the end of the hall, and knocked on the door of a room (not defendant's room).

While Carlos V. was standing at the door at the end of the hall, defendant came out of his room carrying an ice bucket. He saw Carlos V., who was now carrying two bottles of liquor, and they conversed for about a minute. The two men then went into defendant's room.

Sixteen minutes later, Carlos V., now carrying only one bottle, ran through the lobby to his car and drove out of the parking lot. There was no footage of him leaving defendant's room.

About a minute later, defendant and R.G. exited their room and left the hotel. Defendant was carrying what appeared to be the same blue bottle and juice jug with which he entered. They got into their car and drove out of the parking lot.

Seven minutes later, defendant and R.G. returned to the hotel in their car and went back to the second floor. Defendant was still carrying the blue bottle and juice jug. Apparently having forgotten which was their room, they tried, unsuccessfully, to unlock the door to another room. The occupant of that room emerged to see what was happening, and defendant apologized to her. There was no footage of defendant and R.G. actually entering their room.

While the above transpired in the hallway, the parking lot camera recorded a minivan driving out of the lot. Carlos V.'s car

suddenly pulled into the lot next to the minivan, and a second car pulled up in front of the minivan, blocking it. A man in a striped shirt (striped-shirt man) exited the passenger side of Carlos V.'s car and circled the minivan on foot while looking at it. He then looked towards the second car blocking the minivan, which reversed out of the video frame. Someone on the driver's side of Carlos V.'s car, not sufficiently visible to identify, shouted at the occupants of the minivan, who drove off. Striped-shirt man got back into Carlos V.'s car, which then backed out of the parking lot.[1]

About four minutes later, Carlos V., striped-shirt man, and Luis O. walked across the parking lot, into the hotel, and took the elevator to the second floor. They walked almost to the end of the hall, at which point it appeared Carlos V. was not sure which door he was trying to locate. Carlos V. and striped-shirt man listened at a door for a moment. Carlos V. then knocked, while striped-shirt man and Luis O. leaned against the wall, out of view of the door.

While Carlos V. waited for someone to answer the door, two more men, Jose P. and Gerado C., came into the hallway from the lobby staircase and joined striped-shirt man and Luis O. Carlos V. conversed through the door with the room occupant and apparently decided it was the wrong room, at which point he began knocking on other doors. Striped-shirt man, Jose P., and Gerardo C. followed Carlos V., while Luis O. walked to the far opposite end of the hall.

---

[1] The parking lot footage described in this paragraph was presented by the defense, and was not part of the prosecution's case-in-chief.

As Carlos V. was walking down the hall, defendant came out of his room, looking up the hall towards Carlos V., striped-shirt man, Jose P., and Gerardo C. Defendant started walking towards them. Luis O., at the other end of the hall, immediately began running towards defendant, who was turned away from Luis O. and therefore apparently could not see him.

As Luis O. was running up behind defendant, defendant walked past Carlos V. towards striped-shirt man, Jose P., and Gerardo C., shouting, "What's up, homie? What's up, fool?" His hand appeared to be reaching for his waistband in front. Luis O. then reached defendant and grabbed him around the neck in a chokehold.

Defendant at this point had a pistol in his hand and began firing it as Luis O. struggled with him. The other four men took cover. After a moment, Carlos V. and striped-shirt man joined the melee and they and Luis O. wrestled with defendant as shots continued to go off. Defendant wrested his gun hand free and shot Luis O. in the side. Luis O. ran away, down the staircase, as did Jose P.

Carlos V. and striped-shirt man continued to wrestle with defendant as shots went off. At some point striped-shirt man went out of the video frame and only Carlos V. and defendant were grappling. During this struggle, defendant shot Carlos V. in the abdomen.

Despite being shot, Carlos V. continued to grapple with defendant. Striped-shirt man rejoined the fight, followed by defendant's girlfriend R.G., who attempted to pull striped-shirt man and Carlos V. off defendant. Gerardo C. shoved R.G. but otherwise stayed out of the fight. After further struggle, Carlos

V., striped-shirt man, and Gerardo C. fled down the stairs and out of the hotel.

About two minutes later, a camera recorded defendant and R.G. coming out of their room. Defendant had lifted his shirt up, displaying a bleeding wound on the front of his torso. Defendant and R.G. left the hotel and drove off.

It was undisputed at trial that defendant was stabbed during the fight, although it is not clear from the video who stabbed him and when.

### 2. *Carlos V.'s preliminary hearing testimony*

The trial court deemed Carlos V. unavailable at trial, and allowed the investigating detective to read to the jury Carlos V.'s testimony from the preliminary hearing. Carlos V. testified to the following:

Carlos V. went to the hotel to pick up some tequila from a friend. He ran into defendant in the hallway. Carlos V. knew defendant as a customer at the liquor store where Carlos V. worked. Carlos V. had no prior relationship with defendant other than as a customer, and had never fought or argued with defendant.

Carlos V. did not remember about what he and defendant spoke other than it was a friendly conversation. Defendant asked Carlos V. to come to his room. R.G. was in the room.

At this point, Carlos V.'s testimony differed from what he told the police a few days after the incident. The investigating detective testified at trial that Carlos V. told the police when he entered defendant's room, defendant grabbed him by the neck and rifled through his pockets, taking his wallet and phone. Defendant instructed Carlos V. to call his friends and tell them to bring money or defendant would not let Carlos V. go. Defendant

8

asked R.G. to hand him his gun, which is when Carlos V. fled the room.

At the preliminary hearing, however, Carlos V. denied defendant had used force against him, and said he did not remember if defendant took any property from him or told him he could not leave unless his friends brought money. Carlos V. said he did not want to be in court, had been compelled there by subpoena, and was afraid to testify. He said, "I don't snitch."

Carlos V. said he was in defendant's room 10 to 15 minutes before he ran away. He said he ran when defendant reached for something on the left side of the bed. Carlos V. did not know what defendant was reaching for, but thought he had to "[r]un away for my life." Carlos V. took one of the tequila bottles with him.

Carlos V. met up with his friends Luis O., Jose P., and Gerardo C. and returned to the hotel five minutes later. (On the video, the actual time between Carlos V. driving away and returning to the parking lot was approximately 15 minutes.) When asked about the striped-shirt man on the video, Carlos V. said he did not know him.

Carlos V. told his companions he "needed to get back in there and get my stuff," meaning his "[w]allet, phone, money." Carlos V.'s intention was to talk to defendant, not to engage in violence. When asked on cross-examination why Carlos V. had to recover his wallet and phone if, as he had testified, he did not recall defendant taking them from him, Carlos V. said he might have dropped his items in defendant's room.

Carlos V. did not remember what room defendant was in, so he began knocking on doors. Asked why on the video his

companions pressed up against the wall out of sight, Carlos V. said he did not want to scare defendant or make him nervous.

Defendant came out of his room before Carlos V. got to his door. Carlos V. testified when he saw defendant, defendant already was pointing a gun at Carlos V.'s chest. Carlos V., who was unarmed, ran, and that is when defendant began firing. Carlos V. said Luis O. then fought with defendant and "saved my life."

During the struggle, defendant shot Carlos V. in the abdomen. Carlos V. lost a lot of blood and had to have two surgeries that night.

Carlos V. denied being a gang member. Carlos V. believed defendant was a member of the 18th Street gang because defendant gestured to certain tattoos when Carlos V. was in defendant's room.

On cross-examination, defense counsel asked about a knife found at the scene, which defense counsel contended could be seen falling from Luis O.'s hand in the security video. Carlos V. denied knowing Luis O. was armed.

### 3. *Luis O.'s preliminary hearing testimony*

The trial court also deemed Luis O. unavailable for trial, and the investigating detective read Luis O.'s preliminary hearing testimony to the jury. Luis O. testified to the following:

Luis O. and Carlos V. were good friends. The night of the incident, Jose P. and Gerardo C. called Luis O. and told him Carlos V. was being held at the hotel and someone had to bring money to get him out. Luis O. went to the hotel with Jose P. and Gerardo C., and as they were standing outside, Carlos V. came running out.

Carlos V. said "Prayer" had his wallet and ID, and Carlos V. wanted to go talk to him to try to get it back. (Other evidence established that "Prayer" was defendant's gang moniker.) Luis O. testified their intention was to "peacefully talk things out" and they "never wanted no trouble." Neither Carlos V. nor anyone else said defendant had a gun.

When defendant came out of his room, Luis O. saw him "reaching to his crotch area" and taking out a gun. Defendant aimed the gun at Luis O.'s friends and "blurted . . . out" something "aggressive." Luis O. said, "That's why I decided to get involved." Asked if he personally could see the gun, Luis O. said, "I could see. I seen the shininess of the gun."

Luis O. was behind defendant. He approached him and "tried to wrestle the gun out of his hand to save my companions['] life." Luis O. denied having any weapons himself.

Defendant fired "five to nine bullets." One bullet "grazed" Luis O.'s abdomen, after which Luis O. could hear the gun was clicking empty. "That's when I told my friends to run."

Luis O. was asked about the striped-shirt man during cross-examination. He said he did not know him, and "thought [he] was just a random guy." Defense counsel also asked Luis O. about the object in the video defense counsel contended was a knife. Luis O. again stated he was unarmed during the incident.

## 4. *Gang Evidence*

The prosecution sought to admit evidence of defendant's gang membership to explain why, at the preliminary hearing, Carlos V. recanted some of his statements to the police. Over defense objection, the trial court stated it would "allow the People to inquire."

11

The prosecution called Efrain Moreno, an officer with the Los Angeles Police Department, to testify as a gang expert. Moreno opined that defendant was a member of the Columbia Little Psychos clique of the 18th Street gang, and his gang moniker was "Prayer." Moreno explained that to gain status within a gang, members must demonstrate they are "willing to do anything [they are] asked to do. Anything. . . . The more violent crimes you commit, the more respect you will gain from them, the better of a position you will get within the gang." Gang members make money by selling narcotics and committing robbery and extortion. Gangs want to establish themselves as "violent, well-respected gang[s]" to "make sure everybody fears them."

Moreno stated that non-gang-members are less likely to cooperate with the police for fear of the gang retaliating against them. In some cases, people will move away from the gang's territory to avoid retaliation, because "18th Street is huge. They're everywhere." Moreno explained that "snitching" involves giving information to the police. Non-gang-members who snitch could get shot.

The defense objected to a question about defendant's rank in the gang hierarchy. In a sidebar, the prosecution explained defendant's rank was relevant because non-gang-members were unlikely to target a high-ranking gang member. Thus, defendant's rank would tend to show Carlos V. and his compatriots were not at the hotel with the intent to attack defendant. The trial court overruled the objection.

Moreno then testified that defendant was the "shot-caller" for his clique, meaning "the one in charge." He opined that it would be very dangerous for a non-gang-member to attack a shot-

12

caller, because there would "be a very violent response" from the gang.

Moreno never met with Carlos V. or his four compatriots, but after reviewing the security camera footage, he did not believe he was familiar with them. He never received any information that they were gang members, and believed they were not given his lack of interaction with them during his time in the gang unit.

The prosecution asked Moreno about the term "green light," which Moreno explained refers to the Mexican Mafia prison gang ordering a hit on someone outside of prison. Moreno stated the Mexican Mafia would not use non-gang-members to carry out a green light order. Moreno acknowledged that after the incident, defendant spoke to him about a green light order. Moreno had no information about such an order apart from what defendant told him.

### 5.    *Other prosecution evidence*

A trauma surgeon testified that Luis O. and Carlos V. each suffered a single gunshot wound. Carlos V.'s wound would have been fatal without immediate surgery.

Police found a knife and eight spent ammunition cartridges in the hallway, all fired from the same weapon, and bullet holes in the walls. The glass shower door in one of the hotel rooms had been shattered; police recovered a bullet from under the sink. In defendant's room, police found a live round of ammunition matching the cartridges found in the hallway. They also found a bottle of tequila.

## 6. *Defense evidence*

R.G., defendant's girlfriend, testified she never saw Carlos V. in her hotel room, although it was possible Carlos V. and defendant spoke in the entry hall of the room, out of her view.

Asked about the video footage of her and defendant leaving, then returning to the hotel shortly after Carlos V. left, R.G. said upon their return, defendant said he wanted to leave, and left the room. Right after he left, R.G. heard a loud bang and shouting.

R.G. did not recognize any of the men fighting with defendant except for Carlos V., whom she knew as an employee of a liquor store.

R.G. said defendant is a member of the 18th Street gang, and his nickname is "Prayer."

The defense also called the investigating detective and showed him the video footage of striped-shirt man circling the minivan in the parking lot. Asked about an object visible in striped-shirt man's hand, the detective said, "It looks like it could possibly be a knife."

## PROCEDURAL HISTORY

Defendant was charged with two counts of attempted willful, deliberate, and premeditated murder based on his shooting Luis O. and Carlos V. (counts 1 and 2, respectively), with enhancements alleged for use of a firearm and, in Carlos V.'s case, infliction of great bodily injury. He was further charged with two counts of assault with a semiautomatic firearm against Jose P. and Gerardo C. (counts 7 and 8), one count of discharge of a firearm with gross negligence (count 9), and one

14

count of possession of a firearm by a felon (count 10).[2]  In addition, the information alleged several aggravating factors.

The trial court instructed the jury on self-defense and, for the attempted murder counts, the lesser included offense of attempted voluntary manslaughter.

The jury acquitted defendant of attempted murder and attempted voluntary manslaughter of Luis O., but convicted him of attempted voluntary manslaughter of Carlos V. and found true the firearm and great bodily injury allegations.  The jury convicted defendant of both counts of assault with a firearm, as well as the counts for grossly negligent discharge of a firearm and possession of a firearm by a felon.  In a bifurcated court trial, the trial court found true aggravating factors based on defendant's prior convictions, prison terms, and parole or probation status.

The trial court sentenced defendant to a total of 23 years 10 months in state prison.  This consisted of 18 years 6 months for the attempted voluntary manslaughter count, calculated as the high term of 5 years 6 months plus the high term of 10 years for the firearm enhancement and 3 years for the great bodily injury enhancement.  The court then imposed additional consecutive sentences of 2 years each for the assault counts, and 8 months each for the gross negligent discharge and possession counts.  The court imposed fines and fees and awarded credits.

Defendant timely appealed.

_____

[2]  Counts 3 through 6 were counts the prosecution contemplated charging but ultimately chose not to include in the information.

DISCUSSION

## A. The Prosecution Failed To Demonstrate Carlos V. and Luis O. Were Unavailable at Trial Such That the Jury Could Hear Their Preliminary Hearing Testimony

Defendant argues the trial court erred by declaring Carlos V. and Luis O. unavailable at trial and permitting the jury to hear their preliminary hearing testimony. We agree.

### 1. Governing law

Under the federal and state Constitutions, a criminal defendant has the right to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) That right is not absolute. (*People v. Wilson* (2021) 11 Cal.5th 259, 290 (*Wilson*).) "If a witness is unavailable but had previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted." (*Ibid.*; Evid. Code, § 1291, subd. (a)(2) ["Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] . . . The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing"].) This includes preliminary hearing testimony. (*Wilson*, at p. 290.)

Evidence Code section 240, subdivision (a)(5) provides that a witness is " 'unavailable' " if the witness is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her

16

attendance by the court's process." Under this subdivision, "[t]he prosecution must demonstrate that 'the witness is unavailable and, additionally, that it made a "good-faith effort" [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial.' [Citation.] While due diligence lacks a precise definition, [the Supreme Court has] explained that it ' " 'connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character.' " ' [Citation.]" (*Wilson*, *supra*, 11 Cal.5th at p. 291.) "[C]ourts have not found adequate diligence[ when] the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent." (*People v. Bunyard* (2009) 45 Cal.4th 836, 855.) "On the other hand, diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period." (*Id.* at p. 856.)

"We review de novo the trial court's unavailability determination, although we defer to the trial court's determination of historical facts supported by substantial evidence." (*Wilson*, *supra*, 11 Cal.5th at p. 291.) Among the factors to be considered in our independent review are "whether the prosecution timely searched for the unavailable witness, whether the prosecution 'competently explored' leads on the witness's location, and the overall import of the unavailable witness's testimony." (*Ibid.*) "Federal authority also suggests that 'a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available.' [Citation.]" (*Id.* at p. 293.) Further, "when there is knowledge of ' "a substantial risk" ' that an ' "important witness would flee," ' the prosecutor is required to ' "take

17

adequate preventative measures" to stop the witness from disappearing.' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 68 (*Friend*).)

### 2.    *Additional background*

Defendant's preliminary hearing took place on February 28, 2020.  As noted previously, at that hearing, Carlos V. said he did not want to be in court, had been compelled there by subpoena, and was afraid to testify.  He added, "I don't snitch."

On April 13, 2022, the day after jury selection, the trial court held a due diligence hearing regarding the prosecution's efforts to secure Carlos V.'s and Luis O.'s presence at defendant's trial.

The prosecution called Craig Marquez, the investigating detective.  Marquez testified the prosecution requested he make contact with Carlos V. and Luis O. in early November 2021 to make them available to meet with an investigator hired by the defense.  Marquez went to each man's residence and left several phone messages for each of them.  Despite these efforts, Marquez was unable to contact them at that time.

On or around March 3, 2022, Marquez attempted to serve subpoenas on Carlos V. and Luis O. to appear in court on March 16, 2022 for defendant's trial.  Marquez went to each man's residence, and finding neither at home, left his business card.

On March 15, 2022, Marquez again attempted to serve subpoenas for an appearance on April 4, 2022.  Marquez called both men and left messages.  When they did not respond, he went to their residences but again was unsuccessful in serving the subpoenas.  He made similar efforts on April 4, 2022 to serve

18

subpoenas for an appearance on April 7, 2022, again without success.[3]

On April 6, 2022, Marquez located Carlos V. at a hospital. Carlos V. told Marquez he was there for treatment of an infection in his gunshot wound. Marquez served him with a subpoena to appear on April 7, 2022. Carlos V. told him he did not want to come to court.

Carlos V. did not appear on April 7, 2022.[4] Marquez and the prosecutor went to the hospital together that afternoon to speak with him. Carlos V. was still hospitalized, and Marquez was unable to obtain an updated prognosis as to when Carlos V. would be released. When Carlos V. indicated he could get in touch with Luis O., Marquez asked him to do so. Marquez also reiterated that Carlos V. had to come to court to testify. Carlos V. "was uncooperative. He was not desirous of coming to court."

Later that day, after the prosecutor and Marquez left the hospital, Carlos V. was discharged. Since that time, Marquez had called Carlos V. at least four times, but Carlos V. had not returned Marquez's calls. Asked if Carlos V. had "been at any of the locations you've gone to to try to locate him," Marquez said, "As of last night, no." The previous night, April 12, 2022,

---

[3] The trial court continued the trial date several times, and the change in the appearance dates on the subpoenas matched the continued trial dates.

[4] At the April 7 proceeding, the trial court granted the prosecution's request for a continuance until April 11, 2022. The minute order does not indicate the reason for the continuance and the record does not contain a reporter's transcript for that day.

19

uniformed officers had tried twice to serve Marquez with a subpoena but were unable to make contact. Asked if "between you and other uniformed officers, . . . you've attempted to contact [Carlos V.] at different times of the day at the locations," Marquez said yes. Marquez had also arranged for a photograph of the subpoena to be sent to Carlos V.'s phone, along with a text message instructing him to contact Marquez and appear in court.

As for Luis O., Marquez went to his residence on April 11, 2022. No one answered the door, so Marquez left his business card. Later that day, Luis O.'s uncle, with whom Marquez was familiar, called Marquez. The uncle said Luis O. was in Mississippi for a job, which would be completed by the last week of April or the beginning of May 2022. The uncle was unable to give Marquez more specific information about Luis O.'s location or for whom Luis O. was working. Marquez checked whether Luis O. had a Mississippi driver's license, which he did not, nor did Marquez find any indication that Luis O. had been cited or arrested in Mississippi. He therefore had no evidence Luis O. was in Mississippi apart from the uncle's statement.

Marquez confirmed police at no point staked out Carlos V.'s or Luis O.'s residences in an attempt to locate them. Marquez checked if Carlos V. had any arrests or citations in Los Angeles, and found none.

Following argument from the parties, the trial court found the prosecution had exercised due diligence in attempting to secure Carlos V.'s and Luis O.'s presence at trial, and declared both witnesses unavailable. Accordingly, the trial court permitted the jury to hear those witnesses' testimony from the preliminary hearing.

20

### 3. Analysis

Independently reviewing the evidence, we disagree with the trial court's due diligence finding. We note initially that Carlos V. was a crucial witness for the prosecution. The prosecution had to prove that it was defendant, not Carlos V. and his compatriots, who was the aggressor, and therefore he was not entitled to claim self-defense. Carlos V.'s testimony was the sole source of all that transpired between him and defendant in the hotel room before he returned with his companions. Carlos V. also explained why he and his companions returned, despite the threat defendant purportedly represented, and it was Carlos V. who provided the evidence of his peaceful intentions. Carlos V. also testified as to how defendant pointed a gun directly at him, thus instigating the hallway struggle.

Luis O.'s testimony corroborated Carlos V.'s testimony, including defendant's demand for money in exchange for Carlos V.'s release, Carlos V.'s peaceful intentions upon returning to the hotel, and defendant's initiating the conflict by pointing a weapon at Carlos V. and the others.

Both men's testimony particularly was important because the video evidence was somewhat at odds with their version of events. The undisputed evidence indicated that five men, at least one armed with a knife, came to the hotel looking for defendant. As Carlos V. knocked on doors looking for defendant's room, his compatriots pressed themselves against the wall out of sight, and Luis O. positioned himself at the far end of the hall. Carlos V. claimed his companions hid to avoid making defendant nervous, but an equally plausible explanation is that they were positioning themselves for a possible fight. Although Luis O. testified he grabbed defendant because defendant was brandishing a weapon

at Luis O.'s companions, the video shows Luis O. beginning to run up behind defendant as soon as defendant emerged from his room, before defendant had spoken or taken any other action. Although by the time Luis O. reached defendant, defendant either had drawn a gun or was in the process of doing so, it is debatable what actions defendant would have taken had Luis O. not seized him around the throat, at which point defendant began firing his pistol.

Carlos V.'s and Luis O.'s testimony of their peaceful intentions arguably was also in tension with the parking lot footage of Carlos V.'s car and a second vehicle blocking the minivan that was trying to leave, and the striped-shirt man circling the van before the second vehicle moved, allowing the minivan to depart. This suggested Carlos V. and his companions were at the hotel with aggressive intent, or at least that they were not there humbly to negotiate return of Carlos V.'s belongings.

Put simply, Carlos V. and Luis O. were critical witnesses for the prosecution, and had their preliminary testimony not been available, the prosecution undoubtedly would have gone to considerable effort to secure their presence at trial. (See *Wilson*, *supra*, 11 Cal.5th at p. 293 [evaluating whether the prosecution " 'ma[d]e the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available' "].)

Under these circumstances, we conclude the prosecution's efforts to locate Carlos V. and Luis O. fell short. As to Carlos V., there was strong indication he would not come to court voluntarily. He demonstrated significant reluctance to testify at the preliminary hearing, expressly indicating he was not there by

22

choice and was afraid. He did not return Marquez's phone messages in November 2021 or March and April 2022, and no one answered the door when Marquez visited his residence. When Marquez found him at the hospital shortly before trial, he was uncooperative and averse to coming to court.

Despite Carlos V.'s clear reluctance, the prosecution did nothing more to secure his attendance than serve a subpoena. When Carlos V. ignored that subpoena, the prosecution did not change tactics in any significant way, but merely attempted to serve him again, with Marquez this time enlisting the aid of uniformed officers and sending a photograph of the subpoena to Carlos V.'s phone. Our Supreme Court has held that when a witness is indisputably unreliable, "mere service of process does not and cannot satisfy the requirement of due diligence." (*People v. Louis* (1986) 42 Cal.3d 969, 992, fn. 6 (*Louis*).) Nor is it due diligence to repeat the same unsuccessful tactics to serve that subpoena. Although the prosecution hinted through its questions to Marquez that Marquez looked for Carlos V. at locations other than his residence, Marquez gave no specific information as to those other locations, thus providing no substantial evidence of efforts beyond calling Carlos V. and visiting his residence.

As for Luis O., the prosecution and police similarly engaged in repeated unsuccessful attempts to reach him by phone or at his residence, never changing their strategy although it was clear Luis O. was not responsive to these efforts. It was not until the eve of trial when Marquez heard from Luis O.'s uncle that Luis O. was in Mississippi, at which point the prosecution decided nothing more could be done.

23

The prosecution's efforts in the instant case stand in contrast to those found sufficient in *Wilson*, a case in which our high court concluded the witness was *not* "critical" to the prosecution's case. (*Wilson*, *supra*, 11 Cal.5th at p. 293.) In *Wilson*, when the witness at issue failed to appear after receiving a subpoena, police attempted to contact him multiple times at his last known address, his workplace, his ex-girlfriend's home, and his "frequent hangouts." (*Id.* at pp. 288–289, 291–292.) Police interviewed a neighbor who reported the witness had not been at home for months, and confirmed from the witness's ex-girlfriend the witness had moved to an unknown location to avoid testifying. (*Id.* at pp. 291–292.) A police detective also reached the witness by phone, and the witness refused to provide his address or permanent phone number. (*Id.* at p. 292.) Although the witness repeatedly agreed to meet with the detective, he never appeared at the meetings. (*Ibid.*) The prosecution ultimately obtained from the trial court a body attachment order for the witness with bail set at $50,0000. (*Id.* at p. 288.) Still, the witness did not appear. Ten days later, the trial court held a due diligence hearing and concluded the prosecution had made reasonable efforts and the witness was unavailable. (*Id.* at pp. 288–289.) Our Supreme Court agreed. (*Id.* at p. 292.)

Unlike in *Wilson*, the evidence in the instant case does not show the prosecution or police following multiple leads to find Carlos V. and Luis O., such as visiting their workplaces or hangouts or speaking with neighbors and acquaintances. The prosecution did not seek a body attachment order to compel Carlos V.'s compliance with the subpoena he had ignored. Rather, the prosecution team continued its unsuccessful strategy of attempting to serve Carlos V. subpoenas at his home. Apart

from checking if Luis O. had a driver's license or arrest history in Mississippi, Marquez made no further efforts to confirm Luis O. was out of state.

Carlos V.'s reluctance to testify, which he repeated even when served with a subpoena in the hospital, also demonstrated " ' "a substantial risk" ' that an ' "important witness would flee." ' " (*Friend*, *supra*, 47 Cal.4th at p. 68.)  The prosecutor thus was "required to ' "take adequate preventative measures" to stop the witness from disappearing.' [Citation.]" (*Ibid.*)  No such measures occurred; there was, for example, no effort to enforce the subpoena by seeking a body attachment order or to stake out Carlos V.'s home or place of work to ensure he would come to court the next day.

The Attorney General cites case authority for the proposition that "[t]o have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly." (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.)  This is true as a general proposition.  But it does not preclude resorting to strong measures to ensure the appearance of a critical witness like Carlos V.  Here, there was not even evidence that the prosecution informed Carlos V. at the hospital of potentially being arrested if he did not appear, or that the prosecution took steps to monitor Carlos V. to ensure his appearance.

*People v. Fuiava* (2012) 53 Cal.4th 622 (*Fuiava*), cited by the Attorney General, is unavailing.  Although the Supreme Court in that case concluded the prosecution had shown sufficient diligence, the prosecution team in that case had taken more steps to locate the witness than did the prosecution team in the instant

25

case, including checking three different addresses, periodically checking hospital and jail records, attempting to locate the witness's brother, and interviewing neighbors. (*Id.* at p. 677.) Also, as in *Wilson*, the court deemed the witness in *Fuiava* not critical to the prosecution's case, which impacted the due diligence assessment. (*Ibid.*)

The Attorney General notes in *Fuiava*, the court rejected the argument that the prosecution should have kept tabs on the witness between the preliminary hearing and the trial merely because the witness had expressed some fear of testifying. (*Fuiava, supra*, 53 Cal.4th at p. 676.) *Fuiava* stated, " '[W]e could not properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply "disappear," long before a trial date is set.' " (*Ibid.*, quoting *People v. Hovey* (1988) 44 Cal.3d 543, 564.)

Our conclusion is not based on the prosecution's failure to keep tabs on the witnesses between the preliminary hearing and trial. It is based, in Carlos V.'s case, on the prosecution's failure to monitor him or otherwise prevent Carlos V. from disappearing in the few days between when he was located in the hospital and when he was needed at trial. It is further based on the prosecution's failure, as *Fuiava* put it, to "competently pursue[ ] the leads" as to the witnesses' whereabouts. (*Fuiava, supra*, 53 Cal.4th at p. 677.) The prosecution did not develop leads for the most part, limiting its efforts to telephone calls and visits to the witnesses' residences, efforts that yielded no fruit and yet led to virtually no change in tactics.

The Attorney General further cites *Fuiava* for the proposition that " 'it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence [citation], but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising.' " (*Fuiava, supra*, 53 Cal.4th at p. 677.) This proposition does not assist the prosecution here, which hardly exhausted any avenues. There is no reason to conclude that further inquiry or efforts would have been " 'unpromising.' "

In short, we cannot conclude the prosecution would not have made more effort to secure Carlos V.'s and Luis O.'s appearance had it not had those witnesses' preliminary hearing testimony. We therefore cannot conclude the prosecution's efforts demonstrated due diligence so as to allow admission of Carlos V.'s and Luis O.'s preliminary hearing testimony.

The error in admitting that testimony was not harmless. (See *People v. Hull* (2019) 31 Cal.App.5th 1003, 1034–1035 [erroneous admission of prior witness testimony harmless if it is " ' "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" ' "].) As previously discussed, without that testimony, the jury would have had no evidence that defendant had robbed and threatened Carlos V., that Carlos V.'s intentions were peaceful, and that the fight began because defendant pointed a gun at Carlos V. Absent that evidence, it would have been more difficult for the prosecution to establish defendant as the aggressor as opposed to a victim acting in lawful self-defense.

The Attorney General contends the video evidence independently establishes defendant's guilt even without the preliminary hearing testimony. As we have explained, the

27

evidence was close, and the video evidence, in fact, seems at odds with some of Carlos V.'s and Luis O.'s testimony. The verdicts exonerating defendant as to Luis O. but convicting him as to the other victims is further indication of the closeness of the evidence.

We further note that discrepancies between the testimony and the video put Carlos V.'s and Luis O.'s credibility front and center in the case. This made it all the more vital that defendant should have the opportunity to confront those witnesses and challenge their credibility before the jury. (See *Louis*, *supra*, 42 Cal.3d at p. 989 [a witness whose credibility is suspect is "precisely the type of witness that a jury needs to scrutinize in person"].)

We therefore reverse the convictions for voluntary manslaughter, assault with a firearm, and grossly negligent discharge of a firearm. As we discuss *post*, however, defendant does not show that admission of the preliminary hearing testimony was prejudicial as to the charge for possession of a firearm by a felon.

## B. The Evidence Did Not Establish as a Matter of Law That Defendant Acted in Self-Defense

Defendant argues the evidence established as a matter of law that he acted in lawful self-defense, and therefore there was insufficient evidence to convict him of attempted voluntary manslaughter, assault, and grossly negligent discharge of a firearm. We disagree.

" 'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record

28

must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

A shooting " 'based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury[ ] is a complete justification, and such a killing is not a crime.' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 648, italics omitted.) The self-defense doctrine, however, " 'may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' " (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333.) Further, to the extent a defendant's belief that he is in imminent danger of death or great bodily injury is *unreasonable*, he may not claim self-

defense—rather, a killing under those circumstances constitutes voluntary manslaughter under the doctrine of imperfect self-defense. (*Beck and Cruz*, at p. 648.)

As defendant characterizes the evidence, five men, some armed with knives, came to the hotel with the intent to attack him. When he emerged from his room, they immediately placed him in a chokehold from behind and stabbed him, thus justifying his use of lethal force to protect himself.

Defendant presents one hypothesis supported by the evidence, but it is not the only one, even if we look solely to the video evidence. By acquitting defendant of the shooting of Luis O., the jury apparently concluded defendant was entitled to use lethal force in that circumstance after Luis O. placed him a chokehold. The jury could have concluded differently, however, as to the other victims. The jury might have found, for example, that defendant drew his pistol before he realized Luis O. was behind him, thus committing assault, a felony, which both obviated a claim of self-defense and entitled the victims to respond in kind.

*People v. Collins* (1961) 189 Cal.App.2d 575, cited by defendant, is distinguishable. In *Collins*, the defendant claimed he clubbed a man to death with a wine bottle when the man attempted to sexually "molest" him. (*Id.* at p. 579.) Following a bench trial, the court convicted the defendant of voluntary manslaughter. (*Id.* at p. 577.) The Court of Appeal reversed, finding the evidence established as a matter of law that the defendant acted in self-defense. (*Id.* at pp. 592–593.) The court noted, inter alia, there "was nothing inherently improbable in defendant's account of the affray and no evidence that it occurred in any manner other than" that presented by the defendant. (*Id.*

at p. 590.) The physical evidence, including the comparative size of the defendant and the victim "tend[ed] to corroborate defendant's statements." (*Ibid.*) There was no evidence of previous animosity between the defendant and the victim, "no evidence of any motive other than self-defense," and "no evidence of an intent to kill, or of flight, or of anything indicating a consciousness of guilt." (*Ibid.*) "There was no evidence disproving the claim of self-defense." (*Id.* at p. 591.)

A crucial difference between *Collins* and the instant case is here there was indeed evidence that the shooting occurred in a manner other than that advanced by the defense. As previously detailed, there was evidence to support the conclusion that defendant initiated the conflict by brandishing his weapon at Carlos V., Jose P., and Gerardo C., which the jury could conclude he did before he knew Luis O. was behind him. It cannot be said as a matter of law that defendant acted in self-defense, when the evidence could support a different conclusion.[5]

## C. We Do Not Reach Defendant's Other Arguments

Defendant contends the trial court erroneously admitted irrelevant and unduly prejudicial evidence of his gang membership, and compounded that error by not providing a limiting instruction constraining the jury's use of that evidence. Defendant further argues the trial court did not adequately instruct the jury that self-defense was a defense to the two counts

---

[5] The fact there was evidence substantial enough to negate defendant's claim of self-defense does not undercut our conclusion that the admission of Carlos V.'s and Luis O.'s preliminary hearing testimony was prejudicial error requiring reversal.

of assault with a firearm.[6] Because we reverse on the basis of erroneous admission of Carlos V.'s and Luis O.'s preliminary hearing testimony, we decline to reach these additional arguments.

## D. There is No Basis To Reverse the Conviction for Possession of a Firearm By a Felon

Defendant raises no arguments specific to his conviction for possession of a firearm by a felon, nor does he demonstrate that any of his claims of error requires reversal of that conviction. The elements of the offense are " 'conviction of a felony and . . . knowing possession, custody, or control of a firearm.' [Citations.]" (*People v. Clark* (2021) 62 Cal.App.5th 939, 952, fn. 10; Pen. Code, § 29800, subd. (a)(1).) Defendant stipulated to a prior felony conviction, and the video evidence was unmistakable in showing that he knowingly possessed a firearm, which he drew and fired. Beyond a reasonable doubt, the jury would have convicted defendant of that offense regardless of the erroneous admission of Carlos V.'s and Luis O.'s preliminary hearing testimony, or the purported errors in admitting gang testimony or inadequately instructing the jury on self-defense as to the assault charges. Any such errors therefore were harmless as to the conviction for possession of a firearm by a felon.

---

[6] In his opening brief, defendant also argues the trial court did not adequately instruct the jury that self-defense applied to the charge of grossly negligent discharge of a firearm. In his reply brief, defendant expressly withdraws this argument.

## DISPOSITION

The judgment of conviction for count 10, possession of a firearm by a felon, is affirmed.  The judgment of conviction otherwise is reversed, and the entire sentence is vacated.

The matter is remanded to the trial court with directions to allow the People to retry the reversed counts.  Following retrial, or if the People elect not to proceed with retrial, the trial court shall resentence defendant and send a new abstract of judgment to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED.</u>


BENDIX, Acting P. J.


We concur:



CHANEY, J.



WEINGART, J.